**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KATHLEEN HOUSEMAN, derivatively on behalf of SKECHERS USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT GREENBERG, MICHAEL GREENBERG, JOHN VANDEMORE, DAVID WEINBERG, JEFFREY GREENBERG, MORTON ERLICH, GEYER KOSINSKI, RICK RAPPAPORT, ROBERT SISKIND, and THOMAS WALSH, <br><br> Defendants, <br><br> -and- <br><br> SKECHERS USA, INC., <br><br> Nominal Defendant. | Case No.: _____ <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Kathleen Houseman ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of nominal defendant Skechers USA, Inc. ("Skechers" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Skechers with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Skechers; (iii) two purported class action lawsuits filed in the United Stated District Court for

the Southern District of New York against Skechers and defendants Robert Greenberg ("R. Greenberg"), John Vandemore ("Vandemore"), and David Weinberg ("Weinberg") alleging violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact and the alleged omission of material facts necessary to make other issued statements not misleading, between October 19, 2017 and July 19, 2018 (the "Relevant Period")[1] with respect to Skechers' Selling, General & Administrative ("SG&A") expenses and sustainability of sales in international markets; and (iv) other publicly available information, including media and analyst reports, concerning Skechers.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Skechers against certain of its officers and members of the Company's Board of Directors (the "Board") asserting claims for breach of fiduciary duty, insider selling and misappropriation of information, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder.

2.      Skechers is a Delaware corporation founded in 1992 and headquartered in Manhattan Beach, California.  Skechers designs and markets footwear and apparel for men, women, and children, selling its products in over 170 countries.

3.      Prior to the Relevant Period, Skechers experienced rapid sales growth, particularly in international sales.  For the five fiscal quarters preceding the beginning of the Relevant Period, Skechers' SG&A expense growth regularly outpaced its net sales growth.  At the beginning of the Relevant Period, the Company appeared to have slowed this trend and the Individual Defendants

---

[1] The class action lawsuits both state that October 20, 2017 is the beginning of the alleged class period, but include alleged false statements beginning on October 19, 2017.

explicitly assured investors the SG&A expense growth was temporary with the Company returning to "leverage" on its SG&A expenses.

4.     Contrary to those statements, the Individual Defendants failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) Skechers did not have the operational infrastructure required to meet growing demand and sustain sales growth in China; (2) Skechers' international sales growth, particularly in China, was unsustainable without significant increases in the Company's SG&A expenses; (3) as a result, the Company was relying on expensive, third-party operational solutions; (4) as a result of the foregoing, SG&A expenses would continue to exceed sales growth for the foreseeable future; and (5) as a result of the foregoing, the Company's statements about Skechers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

5.     On April 19, 2018, the truth began to emerge with the Company's first quarter 2018 financial results report. For the first quarter of 2018, Skechers reported SG&A expense growth of 23.4% from the previous year quarter compared to only 16.5% in sales growth and 19.6% growth in earnings from operations. Regardless, the Individual Defendants continued the charade of "leveraging" SG&A expenses, with defendant Weinberg falsely reassuring investors that SG&A expenses would return to leverage in the near future.

6.     On this news, the Company's share price fell 27%, on unusually heavy trading volume of over 37 million shares, resulting in a loss of $1.5 billion in market capitalization.

7.     On July 19, 2018, the full truth was finally revealed to investors during the Company's second quarter 2018 financial results conference call. Skechers reported SG&A

expenses increasing 19.7% from the previous year quarter compared to a mere 10.6% increase in sales growth for the same quarter, ***causing earnings from operations to decrease by 5.7%***.

8.     On this news, the Company's share price fell 20.1%, on unusually heavy trading volume of over 53 million shares, resulting in a loss of $947 million in market capitalization.

9.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.  Further, defendants R. Greenberg, Michael Greenberg ("M. Greenberg"), Weinberg, Jeffrey Greenberg ("J. Greenberg"), Morton Erlich ("Erlich"), Rick Rappaport ("Rappaport"), Robert Siskind ("Siskind"), and Thomas Walsh ("Walsh") breached their fiduciary duties of loyalty and good faith by selling shares of Company stock while in possession of material adverse non-public information that was a proprietary asset of the Company.  In addition, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting Skechers' stockholder votes for director re-election, while simultaneously misrepresenting and/or failing to disclose the Company's problems related to its SG&A expenses and unsustainable sales growth.

10.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Skechers has sustained damages as described below.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

12. This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over nominal defendant Skechers because it is authorized to do business in this state, has consented to service in this state, and is incorporated within this District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Skechers occurred in this District, and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14. Plaintiff is a stockholder of Skechers, was a stockholder of Skechers at the time of the wrongdoing alleged herein, and has been a stockholder of Skechers continuously since that time.

### Nominal Defendant Skechers

15. Nominal defendant Skechers is a Delaware corporation with its principal executive offices at 228 Manhattan Beach Boulevard, Manhattan Beach, California 90266. Skechers' common stock trades on the New York Stock Exchange under the symbol "SKX."

### The Individual Defendants

16. Defendant R. Greenberg, along with his sons, founded Skechers. He has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board since October 1993. As of March 23, 2018, R. Greenberg beneficially owned 12.4% of the Company's Class A shares, 75.9% of the Company's Class B shares, and 35.2% of the aggregate number of votes eligible to

be cast by stockholders. As of December 31, 2017, members of R. Greenberg's immediate family beneficially owned an additional 10.9% of Skechers' outstanding Class B shares, and Gil Schwartzberg, trustee of several trusts formed by R. Greenberg and his wife for estate planning purposes, beneficially owned 34.3% of the outstanding Class B shares. R. Greenberg's compensation for 2017 totaled $7,773,992, of which $3,004,252 represented cash incentive awards based on Company performance levels. While in possession of non-public information that caused the share price of Skechers to be artificially inflated, R. Greenberg sold 537,814 shares of Skechers common stock for proceeds of $20.3 million.

17.     Defendant M. Greenberg founded Skechers with his brother and defendant R. Greenberg. He has served as Skechers' President and a director since 1992 and served as Chairman of the Board from June 1992 to October 1993. As of March 23, 2018, M. Greenberg beneficially owned 1.3% of the Company's Class A shares and 4.1% of the Class B shares. For 2017, M. Greenberg's total compensation amounted to $5,222,392, of which $1,502,127 represented cash incentive awards based on Company performance levels. While in possession of non-public information that caused the share price of Skechers to be artificially inflated, M. Greenberg sold 150,000 shares of Skechers stock for proceeds of nearly $4.8 million.

18.     Defendant Vandemore has served as Skechers' Chief Financial Officer ("CFO") since November 2017. Vandemore's initial annual base salary as of November 2017 was $750,000. For 2017, Vandemore's total compensation was $2,116,985.

19.     Defendant Weinberg has served as the Company's Chief Operating Officer ("COO") since January 2006. Weinberg was Skechers' CFO from September 2009 to November 2017 and has served as Executive Vice President and a director since July 1998. In 2017, Weinberg's total compensation was $3,657,299, of which $901,277 represented cash incentive

awards based on Company performance levels.  While in possession of non-public information that caused the share price of Skechers to be artificially inflated, Weinberg sold 48,393 shares of Skechers stock for proceeds of $1.6 million.

20.     Defendant J. Greenberg founded Skechers with R. Greenberg and M. Greenberg. He has served as the Company's Senior Vice President of Active Electronic Media since June 2005, and as a director since September 2000.  From January 1998 to June 2005, J. Greenberg was Skechers' Vice President of Active Electronic Media.  From June 1992 to July 1998, he served as the Company's COO, Secretary, and a director.  From June 1992 to October 1993, J. Greenberg served as the Company's CEO.  As of March 23, 2018, J. Greenberg beneficially owned 1.5% of the Company's Class A shares and 4.6% of the Class B shares.  While in possession of non-public information that caused the share price of Skechers to be artificially inflated, J. Greenberg sold 285,000 shares of Skechers stock for proceeds of $9.3 million.

21.     Defendant Erlich has been a director since January 2006 and an independent investor and consultant since October 2004.  Erlich is Chair of the Board's Audit Committee and a member of the Compensation and Nominating and Governance Committees.  As a director, Erlich earned $127,000 in 2017.  While in possession of non-public information that caused the share price of Skechers to be artificially inflated, Erlich sold 4,000 shares of Skechers stock for proceeds of $134,620.

22.     Defendant Kosinski has served as a director since November 2001.  Kosinski is a member of the Board's Audit Committee.  As a director, Kosinski earned $68,000 in 2017.

23.     Defendant Rappaport has served as a director since September 2010.  As a director, Rappaport earned $56,000 in 2017.  While in possession of non-public information that caused the

share price of Skechers to be artificially inflated, Rappaport sold 1,000 shares of Skechers stock for proceeds of $38,240.

24.     Defendant Siskind has served as a director since June 1999.  Siskind is Chair of the Board's Compensation Committee and a member of the Audit and Nominating and Governance Committees.  Siskind is also the appointed Lead Independent Director for the Board.  As a director, Siskind earned $110,000 in 2017.  While in possession of non-public information that caused the share price of Skechers to be artificially inflated, Siskind sold 25,500 shares of Skechers stock for proceeds of $851,700.

25.     Defendant Walsh has served as a director since September 2010 and as a private investor and consultant since November 2006.  Walsh is Chair of the Board's Nominating and Governance Committee and a member of the Compensation Committee.  As a director, Walsh earned $98,000 in 2017.  While in possession of non-public information that caused the share price of Skechers to be artificially inflated, Walsh sold 750 shares of Skechers stock for proceeds of $26,107.50.

26.     Defendants R. Greenberg, M. Greenberg, Vandemore, Weinberg, J. Greenberg, Erlich, Kosinski, Rappaport, Siskind, and Walsh are collectively referred to herein as the "Individual Defendants."

27.     Defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Kosinski, Rappaport, Siskind, and Walsh are collectively referred to herein as the "Director Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of Skechers and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its stockholders the fiduciary obligations of good

faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly exercised control over the wrongful acts complained of herein.

30. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Skechers were required to, among other things:

a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.      Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.      Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

31.      Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SPECIFIC CORPORATE GOVERNANCE
## RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

32.      The Company has adopted a Code of Business Conduct and Ethics (the "Code") "designed to promote honest and ethical conduct among [Skechers'] employees, officers and directors."  The Code states in relevant part:

**B.    COMPLIANCE WITH LAWS, RULES AND REGULATIONS**

Company policy requires that SKECHERS, as well as all employees, officers and directors of the Company, comply fully with both the spirit and the letter of all laws, rules and regulations. Whenever an applicable law, rule or regulation is unclear or seems to conflict with either another law or any provision of this Code, all employees, officers and directors are urged to seek clarification from their supervisor, the Human Resources Department or the Legal Department, as appropriate. See below for contact information. Beyond mere compliance with the law, we should always conduct our business with the highest standards of honesty and integrity – wherever we operate.

33.    For directors and officers, the Code states specifically:

**A.    SPECIAL OBLIGATIONS OF DIRECTORS AND SENIOR OFFICERS**

Directors and the Company's Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer, principal accounting officer or controller or persons performing similar functions (together "Senior Officers") have a leadership responsibility and should strive to create a culture of high ethical standards, to encourage commitment to legal compliance, to maintain a work environment that encourages Company employees to raise concerns and to assure prompt attention to employee compliance concerns.

*        *        *

**I.    SPECIAL DISCLOSURE OBLIGATIONS OF SENIOR OFFICERS**

The Company's policy is to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws, rules and regulations in all reports and documents the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by or on behalf of SKECHERS. Accordingly, each Senior Officer has the following specific responsibilities with respect to the Company's financial reporting and public disclosures:

•    Each Senior Officer shall seek to ensure that the Company's financial statements and other disclosures comply with all applicable laws, rules and regulations.

•    Each Senior Officer shall promptly bring to the attention of the Company's Disclosure Committee and its Audit Committee any material information of which he or she becomes aware that affects the disclosures previously made by the Company in its public filings.

- Each Senior Officer shall promptly bring to the attention of the Company's Disclosure Committee and its Audit Committee any information he or she may have concerning (1) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, and (2) any fraud, whether or not 10 material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

- Each Senior Officer shall promptly bring to the attention of the Company's General Counsel and its Audit Committee any information he or she may have concerning any employee's effort to improperly influence, coerce, manipulate or mislead any independent public accountant or internal auditor engaged to audit or review any of the Company's financial statements or books and records.

- Each Senior Officer shall promptly bring to the attention of the Company's General Counsel and its Audit Committee any information he or she may have concerning any violation of this Code by any member of management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

- Each Senior Officer shall promptly bring to the attention of the Company's General Counsel and its Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

34.     The Company's definitive proxy statement filed on Form DEF 14A with the SEC on April 12, 2018 (the "2018 Proxy") notes, "[o]ur Board of Directors is responsible for the oversight of risk management. The Board of Directors delegates much of this responsibility to the various committees of the Board."

35.     One of the Board's designated committees is the Audit Committee.  The Audit Committee's Charter states in pertinent part:

> The purpose of the Audit Committee of the Board of Directors is to assist the Board in fulfilling its responsibility for oversight and evaluation of (1) the quality and integrity of the Company's financial statements, (2) the effectiveness of the Company's internal control over financial reporting, (3) the Company's compliance with legal and regulatory requirements, (4) the registered public accounting firm's qualifications and independence, and (5) the performance of the Company's internal audit function and registered public accounting firm, and such other duties

as directed by the Board. The Audit Committee is expected to maintain free and open communication (including separate private executive sessions at least annually) with the registered public accounting firm, the internal auditors and the management of the Company. In discharging this oversight role, the Audit Committee is empowered to investigate any matter brought to its attention, with full power to retain external auditors, outside counsel or other experts for this purpose. The Audit Committee shall review this Charter periodically and recommend any proposed changes to the Board for approval.

36.     The Audit Committee's responsibilities and duties include the following:

(2)     The Audit Committee shall obtain and review a report from the registered public accounting firm at least annually regarding (i) the registered public accounting firm's internal quality-control procedures, (ii) any material issues raised by the most recent quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (iii) any steps taken to deal with any such issues, and (iv) all relationships between the registered public accounting firm and the Company. discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, relating to the conduct of the audit and any other material written communications between the independent auditor and management, including but not limited to, the management representation letter and schedule of adjusted differences and a listing of adjustments and reclassifications not recorded, if any;

*     *     *

(4)     The Audit Committee shall review the Company's annual audited financial statements prior to filing or distribution, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." 3 Review should include discussion with management and the registered public accounting firm of significant issues regarding accounting principles, practices and judgments. The Audit Committee shall advise management and the registered public accounting firm that they are expected to provide to the Audit Committee a timely analysis of significant financial reporting issues and practices; and obtain from the registered public accounting firm assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934, as amended.

(5)     The Audit Committee shall review reports from the registered public accounting firm on (i) the Company's critical accounting policies and practices, (ii) all alternative treatments of financial information permitted under GAAP that have been discussed with management, the ramifications of the use of such treatments and the treatment preferred by the registered public accounting firm, and (iii) all

other material written communications between the registered public accounting firm and management.

(6)     The Audit Committee shall review with financial management and the registered public accounting firm the Company's quarterly financial results prior to the release of earnings and/or the Company's quarterly financial statements prior to filing or distribution including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Audit Committee shall review and discuss with financial management earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), and discuss financial information and earnings guidance, if any, provided to analysts and rating agencies. The Audit Committee shall discuss any significant changes to the Company's accounting principles and any items required to be communicated by the registered public accounting firm in accordance with Auditing Standard No. 16, Communications with Audit Committees.

(7)     The Audit Committee shall, in consultation with management and the registered public accounting firm, consider the adequacy and effectiveness of the Company's financial reporting processes and controls. The Audit Committee shall discuss policies with respect to risk assessment and risk management, including discussion of significant financial risk exposures and risk of fraud and the steps management has taken to monitor, control and report such exposures.

(8)     The Audit Committee shall review with the registered public accounting firm significant findings prepared by the registered public accounting firm together with any audit problems or difficulties and management's responses. The review shall include the resolution of any significant problems or difficulties and management's responses, including with respect to: (1) any restrictions on the scope of the registered public accounting firm's activities or access to requested information; (2) any significant disagreements with management; (3) any accounting misstatements or disclosures that were noted or proposed by the auditor but were "passed" as immaterial; (4) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and (5) any "management" or "internal controls" letter issued or proposed to be issued. The review shall include the resolution of any significant problems and material disputes between management and the registered public accounting firm and a discussion with the registered public accounting firm out of management's presence of the quality of the Company's accounting principles as 4 applied in its financial reporting, including any significant changes in the Company's selection or application of accounting principles, the clarity of the Company's financial disclosures and a discussion of other significant decisions made by management in preparing the financial disclosures.

(9)     The Audit Committee shall obtain and review disclosures made by the Company's principal executive officer and principal financial officer regarding

compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls for financial reporting and evaluations thereof.

(10)    The Audit Committee shall review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

(11)    The Audit Committee shall review the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

*        *        *

(13)    With respect to the Company's internal audit and risk management functions, the Audit Committee shall:

- review the appointment, retention and/or replacement of the vice president of the internal audit department (or other person, persons or outside firm responsible for the Company's internal audit function) and ensure the independence of the vice president of the internal audit department, or, at the discretion of the Board, select and contract with an outside accounting firm to serve as the Company's internal auditors and perform the Company's internal audit function;

- approve, and periodically review and revise as necessary, an Internal Audit Charter, which describes the mission, scope of work, independence, authority, and responsibilities conferred by the Audit Committee on the Company's Internal Audit function;

- advise the vice president of the internal audit department (or other person, persons or outside firm responsible for the Company's internal audit function) that he or she is expected to provide to the Audit Committee summaries of and, as appropriate, the significant reports to management prepared by the internal audit department (or other person, persons or outside firm responsible for the Company's internal audit function) and management's responses thereto and review such reports;

- discuss with the Company's registered public accounting firm responsibilities of the internal audit department (or such other person, persons or outside firm responsible for the Company's internal audit function), the budget and staffing relative to the 5 Company's internal audit function and any recommended changes in the planned scope of the Company's internal audit; and

- discuss with the internal auditor department management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002, including any material weaknesses or significant deficiencies identified.

(14)    The Audit Committee shall discuss with the registered public accounting firm the characterization of deficiencies in internal control over financial reporting. The Audit Committee shall also discuss with management its remediation plan to address internal control deficiencies.

*       *       *

(16)    The Audit Committee shall review the Company's policies and practices related to compliance with the law, the Company's Code of Ethical Conduct, and conflicts of interest, to be satisfied that such policies are adequate and adhered to by the Company and its executive officers and directors.

(17)    The Audit Committee shall review (i) at least annually a summary of directors' and officers' related party transactions and potential conflicts of interest and the Company's policies relating to the avoidance of conflicts of interest, (ii) past and proposed transactions between the Company, on the one hand, and any related parties, including its directors and executive officers, on the other hand, and (iii) policies and procedures as well as audit results associated with directors' and officers' expense accounts and perquisites, including the use of corporate assets. The Audit Committee will discuss with management the business rationale for the transactions and whether appropriate disclosures have been made under SEC Regulation S-K Item 404. The Audit Committee shall consider the results of any review of any of the foregoing by the Company's registered public accounting firm.

(18)    The Audit Committee shall maintain and review annually procedures for (i) the receipt, retention and treatment of complaints received by the Committee regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

*       *       *

(20)    The Audit Committee shall annually prepare an audit committee report to stockholders as required by the Securities and Exchange Commission. The report should be included in the Company's annual proxy statement.

37.    The Individual Defendants failed to maintain the standards laid out by the law and the Company itself, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

39.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Sections 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Skechers was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Skechers and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

A.     **Company Background**

43.     Skechers is a global company specializing in the design and marketing of footwear and apparel for men, women, and children in over 170 countries.  Skechers' products are sold through department and specialty stores, athletic and independent retailers, boutiques and internet retailers, and at Skechers' e-commerce website and retail stores.  Skechers' brands include, among others, Skechers Sport for men and women comprised of athletic lifestyle products with many featuring sport enhanced comfort features, Skechers Performance, which is a collection focused on specific activities such as running or golf, and Skechers Kids, which includes a range of footwear for children, including the well-known bejeweled and light-up shoes.

44.     Skechers initially incorporated in California in 1992 and reincorporated in Delaware in 1999.  The Company was founded by R. Greenberg and his sons, J. Greenberg and M. Greenberg.  The Company's stated objective is "to profitably grow our operations worldwide while leveraging our recognizable Skechers brand through our diversified product lines, innovative advertising and diversified distribution channels."

B.     **Skechers' Recent Sales Growth and Increasing Expenses**

45.     Skechers operates through three reportable segments: domestic wholesale sales, international wholesale sales, and retail sales, which includes e-commerce sales.  The international wholesale segment generates revenues through:  (1) direct sales to department stores and specialty retail stores using joint ventures in Asia and the Middle East and subsidiaries in the Americas, Europe, and Japan; (2) sales to foreign distributors for sales in Asia, South America, Africa, the

Middle East, and Australia; and (3) royalties from licensees who manufacture and distribute non-footwear products outside the United States.

46.     Skechers' sales have increased rapidly in recent years, especially its international sales, with for example, 72 and 96 international joint venture stores opening during 2016 and 2017, respectively.  Joint venture stores in China and Hong Kong comprised a significant number of these new openings – 39 in 2016 and 70 in 2017.  Indeed, since entering the Chinese market ten years ago, Skechers has reported average annual sales growth of 73%.

47.     Skechers has increased expenses to meet the rising growth in sales.  In accordance with the United States Generally Accepted Accounting Principles ("U.S. GAAP"), Skechers reported SG&A expenses as part of its financial statements filed with the SEC.  SG&A expenses are non-production costs and expenses, such as sales and advertising expenses, corporate expenses, and facility expenses.  As shown in the chart below, in the fiscal quarters preceding the beginning of the Relevant Period, Skechers' SG&A expense growth repeatedly outpaced its net sales growth:

| Fiscal Quarter | Net Sales Growth (Compared to same quarter in the previous year) | SG&A Growth (Compared to same quarter in the previous year) | Earnings from Operations (Compared to same quarter in the previous year) |
|---|---|---|---|
| Second Quarter 2016 | 9.7% | 20.05% | -10.6% |
| Third Quarter 2016 | 10.10% | 12.2% | 8.1% |
| Fourth Quarter 2016 | 5.8% | 16.17% | -48.3% |
| First Quarter 2017 | 9.6% | 16.86% | -10.2% |
| Second Quarter 2017 | 16.9% | 26.9% | -14.0% |

48.     As can be seen in the above chart, earnings from operations declined by large amounts as a result of the exponentially increasing SG&A expenses.  Although concerns regarding the increasing SG&A expenses were raised by analysts during the Relevant Period, Defendants misleadingly assured investors that the SG&A expense growth was temporary and would soon

decline with the Company returning to "leverage" on its SG&A expenses, *i.e.*, returning to sales growing faster than expenses.

### C. The Individual Defendants Caused Skechers to Issue Materially False and Misleading Statements

49.     On October 19, 2017, the Individual Defendants caused Skechers to issue a press release (the "October 2017 Press Release"), also filed with SEC as Exhibit 99.1 to the Company's Form 8-K, announcing the Company's third quarter 2017 financial results.  The October 2017 Press Release stated, in relevant part:

> "Third quarter net sales of $1.095 billion set a new quarterly record for the Company, surpassing our previous record in the first quarter earlier this year by $22 million, and resulted in a new nine month record with sales exceeding $3 billion," stated David Weinberg, chief operating officer and chief financial officer. "The growth came across our three distribution channels—with double-digit increases in our Company-owned Skechers retail business worldwide and our international subsidiary and joint venture businesses, as well as a single-digit increase in our international distributor and domestic wholesale businesses. ***The strong international growth, including the continued strength in China, the resurgence of the United Kingdom and growth across all of Europe combined with our strong international retail business, resulted in international wholesale and retail representing 53 percent of our total sales in the third quarter.***"[2]

> *            *            *

> Quarterly **net sales** increased 16.2 percent to $1.095 billion compared to third quarter 2016. The growth was the result of a 25.7 percent increase in the Company's international wholesale business, a 1.4 percent increase in its domestic wholesale business, and an 18.6 percent increase in its Company-owned global retail business with total comp store sales increases of 4.4 percent.

> *            *            *

> Third quarter **selling expenses** increased $21.8 million to $89.6 million, or 8.2 percent of sales, compared to $67.8 million, or 7.2 percent of sales, in the prior year's third quarter. The increase was primarily due to increased advertising expenses of $17.2 million, including $3.6 million to support our international subsidiary business, and an additional $3.5 million in selling commissions from its joint venture in South Korea.

---

[2] Unless otherwise noted, all emphasis is added.

**General and administrative expenses** were $316.9 million, or 28.9 percent of sales, compared to $261.8 million, or 27.8 percent of sales, in the prior year's third quarter. The year-over-year quarterly increase was primarily due to Skechers' focus on long-term global growth. The increases included $18.1 million associated with the Company's 67 additional domestic and international retail stores—13 of which were opened in the third quarter, and $27.2 million to support its international growth in its joint venture and subsidiary businesses. Domestic wholesale general and administrative expenses in the third quarter increased $9.7 million year-over-year primarily due to increased headcount in the United States to support its brand worldwide, and improvements in its digital operations, as well as the expansion into new categories and brands.

Mr. Weinberg added: "We remain committed to investing in the brand, product, infrastructure, and all areas that will drive further growth opportunities. *Our international business continues to have the highest growth potential—both with emerging international markets such as those in South America as well as India, and our established business across Asia. To further build our brand globally, we grew our Company-owned store base worldwide to 623 locations, including 187 international stores. Combined with the third-party Skechers stores, there were 2,428 Skechers stores around the world at quarter end.*"

**Earnings from operations** were $116.5 million or 10.6 percent of net sales, which was an increase of $13.1 million or 12.7 percent over the third quarter of 2016.

\*       \*       \*

Mr. Greenberg continued: "Now, more so than ever before, we are approaching our business from a global perspective, developing product that will resonate with consumers in the Americas, across Europe, throughout Asia, and the rest of the world. Domestically, the highlight of the third quarter was our back-to-school business, which was led by double-digit sales increases in our Skechers Kids footwear. As with our adult offering, we focused on innovation, comfort and lightweight features, creating a collection that resonated with kids and their parents. The success of our product was most evident in the continued growth of our international business as we achieved strong double-digit growth in the majority of our subsidiary and joint venture managed countries in the third quarter. Further, we are focusing on marketing campaigns that resonate globally—including the signing of singing sensation Camila Cabello, who is known by young women around the world. We believe that with our focus on product, marketing and logistics from a domestic and international perspective, we will continue to see strong growth on a global scale."

50.     The same day, Skechers held an earnings conference call to discuss the third quarter 2017 financial results. During the call, defendant Weinberg was questioned regarding the Company's SG&A expenses:

**Jay Sole**

Got it. Okay. That's great. And then the other question is on just going back to SG&A for next year, is it possible to put a finer point on, where you think you might land in terms of dollars given that you - given, what you know about your store opening plans, the distribution center in China, which I assume is continuing to move forward, where do you think you might end up for dollars in terms of just total SG&A selling expenses plus G&A, when you get into - through 2018?

**David Weinberg**

We haven't finished forecasting all of 2018. . . . *I would tell you the anticipation here is that the rate of growth certainly in the G&A piece will come down from this year, as we end the year there are no new pieces to pick up.*

51.     Another analyst continued questioning Skechers' increasing SG&A expenses:

**Christopher Svezia**

Just want to go back to a question from earlier, when you talked about SG&A process, you start to think about next year, is there a scenario whereby you don't leverage? In other words, this year you're growing 15% and you're deleveraging roughly 200 hundred basis points or so on SG&A. Is there a revenue growth rate, given sort of the thought process around some investments in some markets, whereby you wouldn't leverage or is it just next year under most scenarios you leverage G&A expenses?

**David Weinberg**

Yeah, I'm not a person that would say, never say never. *But I think your last characterization of, for the most part, yeah, most of the scenarios are positive leverage, I think that's correct.*

52.     Following the October 2017 Press Release and earnings conference call, and in response to what appeared at the time to be positive news – the return to positive earnings from operations growth for the first time since the third quarter of 2016 – the stock price of Skechers increased 40%, from a close of $24.03 per share on October 19, 2017, to a closing price of $33.99 per share on October 20, 2017.

53.     On February 8, 2018, Skechers issued a press release announcing its fourth quarter and year-end 2017 financial results (the "February 2018 Press Release"), also attached as Exhibit

99.1 to the Company's Form 8-K filed with the SEC.  The February 2018 Press Release stated, in relevant part:

### Fourth Quarter Highlights

- *Record sales of $970.6 million, an increase of 27.0 percent*
- *Earnings from operations of $55.7 million, an increase of 96.9 percent*
- **GAAP diluted loss per share of $0.43 due to a $0.64 one-time tax expense attributable to the Tax Cuts & Jobs Act, adjusted diluted earnings per share of $0.21**
- *International wholesale sales increased 40.2 percent; total international wholesale and retail sales combined represented 52.6 percent of total sales*
- **Domestic wholesale sales increased 11.6 percent**
- **Company-owned global retail sales increased 25.8 percent, with a comparable same store sales increase of 12.0 percent globally**

"2017 was a monumental year for Skechers as we achieved sales of more than $4 billion for the first time in our 25-year history," began Robert Greenberg, Skechers chief executive officer.  "*This growth is due to our continued focus on efficiencies and infrastructure* as well as innovation, comfort, and relevancy within our product design. In the United States, we remained the No. 1 walking, work, casual lifestyle, and casual dress footwear brand, and the No. 2 casual athletic footwear brand\*.  Our team of legendary athletes and international celebrities, including the chart-topping singer Camila Cabello, drove worldwide appeal in marketing campaigns that represent our diverse product offering—from our heritage retro styling to the innovation and comfort that have become hallmarks of Skechers footwear.  *Furthermore, we grew our Skechers store base to 2,570 locations at year-end and saw impressive growth across the globe—including record sales on Single's Day in China. As we look ahead, with fresh styles shipping for Spring, we believe we will remain a leader in the lifestyle footwear channel in the United States, selectively expand our retail footprint, and continue our global growth as we see our international business becoming an increasingly larger piece of our total business.*"

"With three months of strong sales, a robust holiday selling season that included increased demand for our innovative lighted children's footwear and comfortable adult styles, and double-digit growth in each of our three distribution channels, we achieved a new fourth quarter sales record of $970.6 million," stated David Weinberg, chief operating officer of Skechers.  "The four record sales quarters in 2017 resulted in a new annual sales record of $4.16 billion, an increase of over $600 million from the previous year's sales. *This growth is a testament to the worldwide strength and relevance of our product, marketing and brand.*"

\*          \*          \*

Sales grew 27.0 percent as a result of a 40.2 percent increase in the Company's **international wholesale** business, an 11.6 percent increase in the Company's **domestic wholesale** business, and a 25.8 percent increase in its Company-owned global **retail** business. **Comparable same store sales** in Company-owned stores increased 12.0 percent, including a domestic increase of 10.5 percent and an international increase of 16.5 percent.

**Gross margins** increased due to strength in the Company's international retail business and increased sales in the Company's international subsidiary business.

**SG&A expenses** increased 21.6 percent. This increase was driven by $67.4 million in **general and administrative expenses,** including $37.8 million to support international growth in the Company's joint venture and subsidiary businesses, and $20.1 million associated with operating 75 additional Company-owned Skechers stores, of which 22 were opened in the fourth quarter. **Selling expenses** increased by $4.4 million primarily due to higher international advertising expenses as well as $1.5 million in increased sales commissions in its South Korea joint-venture business.

**Earnings from operations** increased 96.9 percent primarily due to sales growth.

54. Certain Individual Defendants participated in an earnings conference call the same day to discuss the fourth quarter and year-ended 2017 financial results during which defendant Vandemore stated: "The leverage we delivered this quarter gives a glimpse into the opportunity before us as we continue to grow the top line and *leverage our infrastructure investments for the past couple of years*."

55. The Individual Defendants were questioned on advertising expenses:

**John M. Vandemore - SKECHERS USA, Inc.**

We're not giving international percentages*. I mean I think the most remarkable thing about the quarter was . . .*

**Corinna Van Der Ghinst - Citigroup Global Markets, Inc.**

I guess, total.

**John M. Vandemore - SKECHERS USA, Inc**.

[I]n total. *But in the quarter, we leveraged selling expenses significantly. We saw a significant opportunity for leverage. And I think that's a testament to the*

*opportunity, the brand to grow in markets that we've already seeded with selling investment.*

**David Weinberg - SKECHERS USA, Inc.**

*Yeah, I think as far as advertising is concerned and it depends how you want to define it, not just media but our advertising in in-stores. We anticipate that the rate of growth will continue to slow as it has in the past and we'll be able to leverage some.* We are going to change focus and advertise obviously more in international and relatively stable in the U.S. We would think that we're okay in the U.S. and all increases will come from international.

So that's a very positive and we will match the sales. And we anticipate it would stay in the same range, maybe slight leverage as we go through the year.

56.    Once again, the Individual Defendants gave investors false assurances, and Skechers' stock price increased from a closing price of $38.18 per share on February 8, 2018 to a closing price of $41.06 per share on February 9, 2018, a 7.5% increase.

57.    On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for the year-ended December 31, 2017 (the "2017 Form 10-K"). The 2017 Form 10-K was signed by each of the Individual Defendants. R. Greenberg and Vandemore signed certifications pursuant to Rule 13a-14(a) of the Exchange Act and Section 906 of the Sarbanes-Oxley Act of 2002, stating in relevant part that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

58.    The 2017 Form 10-K misleadingly stated:

In 2017, we focused on product development, growing our position in our domestic wholesale accounts, growing our international market share, opening retail stores in key locations worldwide, continuing to develop our global infrastructure, and balance sheet and expense management.

*         *         *

**Balance sheet and expense management.** *During 2017, we continued to focus on managing our balance sheet and bringing our marketing expenses and general and administrative expenses in line with expected sales.*

59. The above statements identified in paragraphs 49-51, 53-55, 57, and 58 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) Skechers did not have the operational infrastructure required to meet growing demand and sustain sales growth in China; (2) Skechers' international sales growth, particularly in China, was unsustainable without significant increases in the Company's SG&A expenses; (3) as a result, the Company was relying on expensive, third-party operational solutions; (4) as a result of the foregoing, SG&A expenses would continue to exceed sales growth for the foreseeable future; and (5) as a result of the foregoing, the Company's statements about Skechers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

**D.    The Individual Defendants Issued a Materially False and Misleading Proxy Statement**

60. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement, which sought stockholder votes for director re-election.

61. On April 12, 2018, the Individual Defendants caused the Company to file with the SEC and disseminate to stockholders the 2018 Proxy in connection with the Company's annual stockholder meeting. The Individual Defendants drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Skechers' stockholders. The Individual Defendants knew, were reckless in not knowing, or were negligent in not knowing, that the 2018 Proxy was materially false and misleading.

62.     Among other things, the 2018 Proxy provided information about the director nominees up for election, defendants R. Greenberg, Erlich, and Walsh.  In addition, the 2018 Proxy described director responsibilities; the duties of each committee; Board risk assessment and management; and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

63.     Specifically, the 2018 Proxy described the Board's risk oversight as follows:

**Role of Board in Risk Oversight**

***Our Board of Directors is responsible for the oversight of risk management.*** The Board of Directors delegates much of this responsibility to the various committees of the Board. ***The Audit Committee is responsible for inquiring of management, our Vice President of Internal Audit and our independent registered public accounting firm about our financial reporting processes, internal controls and policies with respect to financial risk assessment and management. The Chairman of the Audit Committee has periodic discussions with our Vice President of Internal Audit about the adequacy and effectiveness of steps taken to monitor, control and report financial risk exposures, and the Vice President of Internal Audit also presents the Audit Committee with formal periodic status reports as well.*** The Compensation Committee oversees risks related to our compensation programs and ***the Nominating and Governance Committee is responsible for reviewing regulatory and other corporate compliance risks.*** The Board is advised by the committees of significant risks and management's response via periodic updates.

64.     The 2018 Proxy asserted that the Nominating and Governance Committee is responsible for, among other things:  "(iv) overseeing the evaluation of our management, the Board and its committees, (v) evaluating and recommending to the Board changes to the corporate governance guidelines applicable to our company, and (vi) reviewing regulatory and other corporate compliance risks applicable to us."

65.     According to the 2018 Proxy, the Audit Committee is responsible for:

[O]verseeing and evaluating (i) the quality and integrity of our financial statements, (ii) the performance of our internal audit and internal control functions in addition to financial risk assessment and management applicable to our company, (iii) our policies and procedures regarding transactions with related persons, as described in greater detail below in the section entitled "*Transactions with Related Persons,*"

(iv) the appointment, compensation, independence and performance of our independent registered public accounting firm, and (v) our compliance with legal and regulatory requirements.

66.    The 2018 Proxy included the Report of the Audit Committee which, among other things, stated:

The Audit Committee has done the following:

- it reviewed and discussed with Skechers' management, internal finance staff, internal auditors and BDO, with and without management present, Skechers' audited consolidated financial statements for the fiscal year ended December 31, 2017, management's assessment of the effectiveness of Skechers' internal control over financial reporting, and BDO's evaluation of Skechers' internal control over financial reporting;

- it discussed with BDO the results of its examinations and the judgments concerning the quality, as well as the acceptability, of Skechers' accounting principles and such other matters that Skechers is required to discuss with its independent registered public accounting firm under applicable rules, regulations and U.S. generally accepted auditing standards (including Auditing Standard No. 1301, "Communications with Audit Committees" as adopted by the Public Company Accounting Oversight Board); and

- it received from BDO the written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence and discussed with BDO its independence from Skechers and management, including a consideration of the compatibility of non-audit services with their independence, the scope of the audit and the fees paid to BDO during the year.

Based on our review and the discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements for the year ended December 31, 2017 be included in Skechers' Annual Report on Form 10-K for the year ended December 31, 2017 for filing with the SEC.

67.    The 2018 Proxy was false and misleading because it solicited Skechers stockholder votes for director re-election even though the Individual Defendants were aware, but had failed to disclose that:  (1) Skechers did not have the operational infrastructure required to meet growing demand and sustain sales growth in China; (2) Skechers' international sales growth, particularly

in China, was unsustainable without significant increases in the Company's SG&A expenses; (3) as a result, the Company was relying on expensive, third-party operational solutions; (4) as a result of the foregoing, SG&A expenses would continue to exceed sales growth for the foreseeable future; and (5) as a result of the foregoing, the Company's statements about Skechers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

### E.     The Truth Begins to Emerge

68.     On April 19, 2018, Skechers issued a press release announcing its financial results for the first quarter of 2018 (the "April 2018 Press Release"), also filed as Exhibit 99.1 to the Form 8-K filed with the SEC.  The April 2018 Press Release revealed that the Company was not able to "leverage" its SG&A expenses, with SG&A expenses increasing 23.4% from the previous year quarter, compared to a 16.5% increase in sales and a 19.6% increase in earnings from operations.  The SG&A expense increase was attributed to a need to "support international growth in the Company's joint venture and subsidiary businesses" and "higher international advertising expenses."

69.     On the first quarter 2018 earnings conference call that same day, defendant Vandemore repeated the same reasoning for SG&A expense increases as stated in the April 2018 Press Release.  Weinberg continued to mislead investors in responding to an analyst's question regarding leveraging SG&A:

**Jeff Van Sinderen**

Okay.  Good.  And then leverage?  Do you think leverage on SG&A starting in Q3 again?

**David Weinberg**

*I would think so.* You know, that's based on topline and where we are going. Part of the issue is, we have had more of the same we have had in the prior year.  So,

Korea was up but deleveraged somewhat more because we had to put a little more infrastructure than we had anticipated. China is anticipating such strong growth that we had to pump up expenses to handle the business that's coming and a bigger piece of that business is online, which has more infrastructure built because of the uniqueness of shipping one pair at a time for the size they are.

***So we do believe that we will catch up, that the topline will be such and that we will be able to again start to leverage again in Q3.*** It should be a very positive time for us. Just like we felt last year Q1 would be a positive change for us this year as well. And you have to also remember, Jeff, that Easter went into Q1. So of all the things that John was saying about the tough comps, Easter went into Q1, so all of the deliveries really were taken in Q1.

70.     On this news, Skechers' stock price dropped $11.38, or 27%, from a closing price per share of $42.08 on April 19, 2018 to a closing price per share of $30.70 on April 20, 2018 on unusually heavy trading volume of over 37 million shares, wiping out $1.5 billion in market capitalization.

71.     The above statements identified in paragraphs 68 and 69 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) Skechers did not have the operational infrastructure required to meet growing demand and sustain sales growth in China; (2) Skechers' international sales growth, particularly in China, was unsustainable without significant increases in the Company's SG&A expenses; (3) as a result, the Company was relying on expensive, third-party operational solutions; (4) as a result of the foregoing, SG&A expenses would continue to exceed sales growth for the foreseeable future; and (5) as a result of the foregoing, the Company's statements about Skechers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

**F.    The Truth is Revealed**

72.    On July 19, 2018, the Individual Defendants caused Skechers to issue a press release announcing its second quarter 2018 financial results (the "July 2018 Press Release"), also attached as Exhibit 99.1 to the Company's Form 8-K filed with the SEC on the same day.    The July 2018 Press Release shocked the market, with Skechers reporting only $1.13 billion in sales and earnings per share of $0.29, missing the Company's own guidance by $0.10.    The Company also revealed that SG&A expenses grew 19.7% from the previous year quarter, while sales growth was only 10.6%, *resulting in a decrease in earnings from operations by 5.7% and in net earnings by almost 24%.*    The July 2018 Press Release attributed nearly 50% of the increase in general and administrative expenses to the "continued expansion" in China.

73.    Later that day, Skechers held an earnings conference call to discuss the Company's second quarter 2018 financial results.    During this call, certain Individual Defendants revealed that, contrary to earlier representations that the Company would "leverage" its SG&A expenses, for the foreseeable future, SG&A expenses would exceed sales growth and earnings:

**John Kernan**

So I guess, my final question is a bigger picture question.    There has been well over $1 billion of total top line growth.    The past couple of years, there has not been much growth in EBIT.    So I'm just wondering at what point do you think you will trade top line growth for the ability to start growing top line in a more significant rate.    Do you think if you pullback on G&A expenses, do you think the top line would decelerate significantly in line with that?

**David Weinberg**

*We've just don't necessarily think that way.    We're going to grow.    We think that transition sacrificing top line growth for EBIT will happen when the marketplace tell us begin to close it to a saturation point.    Right now, we are built for growth. We have the capital for growth and wouldn't leave anything on the table* . . . .

74.    Analysts responded by downgrading Skechers' stock.    UBS commented: "SKX's China wholesale eCom business (Tmall, etc.) is growing . . . .    *However, because this business is*

*growing so fast, SKX is requiring expensive, 3rd-party operational solutions to keep up with demand. This point, which we previously did not appreciate*, explains much of the negative 2Q & 3Q SG&A surprises and our downward EPS revision."

75.     On this news, the Company's stock price fell 20.1%, from a closing price per share of $33.25 on July 19, 2018 to a closing price per share of $26.27 on July 20, 2018 on unusually heavy trading volume of over 53 million shares, wiping out $947 million in market capitalization.

<u>**INSIDER TRADING ALLEGATIONS**</u>

76.     While in possession of knowledge that Skechers was misleading investors as to the true nature of the Company's SG&A expenses and unsustainable sales, defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh collectively sold 1,052,457 shares of their personal holdings of Skechers at inflated prices reaping net proceeds of over $37 million.

77.     While in possession of this knowledge, R. Greenberg sold 537,814 shares of Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of $20,354,414.91.

**R. Greenberg Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/19/2017 | 400,000 | $37.6881 | $15,075,240.00 |
| 12/20/2017 | 100,000 | $37.5383 | $3,753,830.00 |
| 03/02/2018 | 37,814 | $40.3381 | $1,525,344.91 |
| **TOTALS:** | **537,814** | | **$20,354,414.91** |

78.     While in possession of this knowledge, M. Greenberg sold 150,000 shares of Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of $4,779,225.00.

**M. Greenberg Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/02/2017 | 150,000 | $31.8615 | $4,779,225.00 |
| **TOTALS:** | **150,000** | | **$4,779,225.00** |

79.     While in possession of this knowledge, Weinberg sold 48,393 shares of Skechers

stock during the Relevant Period, at artificially inflated prices, for proceeds of $1,644,108.75.

**Weinberg Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 03/02/2018 | 23,183 | $40.3381 | $935,158.17 |
| 05/02/2018 | 25,210 | $28.1218 | $708,950,58 |
| **TOTALS:** | **48,393** | | **$1,644,108.75** |

80.     While in possession of this knowledge, J. Greenberg sold 285,000 shares of

Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of

$9,298,487.00.

**J. Greenberg Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/20/2017 | 60,000 | $32.2395 | $1,934,370.00 |
| 10/20/2017 | 60,000 | $31.3248 | $1,879,488.00 |
| 10/20/2017 | 60,000 | $31.5981 | $1,895,886.00 |
| 11/012017 | 10,000 | $32.2395 | $322,395.00 |
| 11/01/2017 | 10,000 | $31.3248 | $313,248.00 |
| 11/01/2017 | 10,000 | $31.5981 | $315,981.00 |
| 11/29/2017 | 45,000 | $35.00 | $1,575,000.00 |
| 12/01/2017 | 10,000 | $35.4019 | $354,019.00 |
| 12/01/2017 | 10,000 | $35.4033 | $354,033.00 |
| 12/01/2017 | 10,000 | $35.4067 | $354,067.00 |
| **TOTALS:** | **285,000** | | **$9,298,487.00** |

81.     While in possession of this knowledge, Erlich sold 4,000 shares of Skechers stock

during the Relevant Period, at artificially inflated prices, for proceeds of $134,620.00.  Erlich had

not sold any Skechers stock since 2015.

**Erlich Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/22/2017 | 4,000 | $33.655 | $134,620.00 |
| **TOTALS:** | **4,000** | | **$134,620.00** |

82.     While in possession of this knowledge, Rappaport sold 1,000 shares of Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of $38,240.00.

**Rappaport Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/22/2017 | 1,000 | $38.24 | $38,240.00 |
| **TOTALS:** | **1,000** | | **$38,240.00** |

83.     While in possession of this knowledge, Siskind sold 25,500 shares of Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of $851,700.00. Siskind had not sold any Skechers stock since 2010.

**Siskind Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/24/2017 | 25,500 | $33.40 | $851,700.00 |
| **TOTALS:** | **25,500** | | **$851,700.00** |

84.     While in possession of this knowledge, Walsh sold 750 shares of Skechers stock during the Relevant Period, at artificially inflated prices, for proceeds of $26,107.50.

**Walsh Stock Sales**

| Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/27/2017 | 750 | $34.81 | $26,107.50 |
| **TOTALS:** | **750** | | **$26,170.50** |

85.     Rather than providing the market with accurate information, defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh used their knowledge of Skechers' material nonpublic information to dispose of millions of dollars' worth of their Company stock at a time when Skechers' stock price was artificially inflated by the

improper statements. These insider sales totaled over $37 million and were all executed while Skechers' stock price was artificially inflated due to the unlawful conduct alleged herein.

**SHARE REPURCHASES**

86. During the Relevant Period, during which the Individual Defendants caused the Company to make materially false and misleading statements and omissions, the Individual Defendants also caused the Company to initiate the repurchase of its common stock which substantially damaged the Company. In February 2018, the Director Defendants authorized a stock repurchase program under which the Company planned to repurchase up to $150 million of its Class A common stock in the open market at prevailing prices. As of June 30, 2018, the Company had spent $18 million to repurchase approximately 586,572 shares of its own stock under the repurchase plan.

87. As the Company's stock was artificially inflated due to the Individual Defendants' false and misleading statements and omissions, and only worth $26.27 per share, the price at which it closed on July 20, 2018, the Company overpaid $2.5 million in total for these share repurchases.

**DAMAGES TO SKECHERS**

88. As a result of the Individual Defendants' wrongful conduct alleged herein, Skechers disseminated false and misleading statements and omitted material information that would have rendered the statements neither false nor misleading. The improper statements have devastated the Company's credibility. Skechers has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

89. Indeed, the Individual Defendants' false and misleading statements as alleged herein have subjected Skechers to two complaints for violations of the federal securities laws filed in the United States District Court for the Southern District of New York, captioned *Laborers*

*Local 235 Benefit Funds v. Skechers USA, Inc., et al.*, Case No. 1:18-cv-08039, and *Fishman v. Skechers USA, Inc., et al.*, Case No. 1:18-cv-09510 (the "Securities Class Actions").

90.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Skechers' market capitalization has been substantially damaged, and has lost billions of dollars in value as a result of the conduct described herein.

91.     Moreover, these actions have irreparably damaged Skechers' corporate image and goodwill.  For at least the foreseeable future, Skechers will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Skechers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

94.     Plaintiff owns Skechers common stock and owned Skechers common stock at all times relevant hereto.

95.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

96.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Skechers Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

97.     At the time this action was commenced, the Board consisted of nine directors: defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Kosinski, Rappaport, Siskind, and Walsh.  All nine members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**A.      Demand is Futile as to Defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Kosinski, Rappaport, Siskind, and Walsh Because They Each Face a Substantial Likelihood of Liability**

98.     The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

99.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

100.    The Director Defendants consciously and knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required

diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Skechers to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to the Director Defendants.

**B.** **Demand is Excused as to Defendants R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh Because They Financially Benefited From the False and Misleading Statements**

101. As noted above, R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh personally benefited from the materially false and misleading statements by having an opportunity to sell shares of Skechers stock at artificially inflated prices, a benefit not shared by Skechers' public stockholders. Accordingly, demand is futile as to R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh.

**C.** **R. Greenberg Lacks Independence**

102. R. Greenberg is not disinterested for purposes of demand futility because he is a founder of Skechers and his principal occupation is CEO and Chairman of the Board. According to the Company's SEC filings, in 2017, R. Greenberg received total compensation of $7,773,992. This amount is material to him.

103. Additionally, five of R. Greenberg's children are employed by the Company. In addition to defendants M. Greenberg and J. Greenberg, as more fully described herein, for 2017, Jason Greenberg, Joshua Greenberg, and Jennifer Greenberg Messer earned total compensation of $2,280,362, $1,649,339, and $363,820, respectively, as employees of Skechers. Those amounts are material to R. Greenberg's children.

104. Further, R. Greenberg is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

### D. M. Greenberg Lacks Independence

105. Like R. Greenberg, M. Greenberg is an executive officer, director, and one of the founders of Skechers. M. Greenberg is not disinterested for purposes of demand futility because his principal occupation is President and director of Skechers. According to the Company's SEC filings, in 2017, M. Greenberg received total compensation of $5,222,392. This amount is material to him.

106. Additionally, M. Greenberg's father and four of his siblings are employed by the Company. In addition to defendants R. Greenberg and J. Greenberg, as more fully described herein, for 2017, Jason Greenberg, Joshua Greenberg, and Jennifer Greenberg Messer earned total compensation of $2,280,362, $1,649,339, and $363,820, respectively, as employees of Skechers. Those amounts are material to M. Greenberg's immediate family members.

107. Further, M. Greenberg owns a 12% beneficial ownership interest in the Manhattan Inn Operating Company, LLC ("MIOC") which owns and operates the Shade Hotel in Manhattan Beach. For 2017, Skechers paid $172,000 to MIOC for lodging, food, and events at the Shade Hotel in Manhattan Beach. M. Greenberg also owns a 5% beneficial ownership interest in the Redondo Beach Hospitality Company, LLC ("RBHC") which owns and operates the Shade Hotel in Redondo Beach. For 2017, Skechers paid $201,000 to RBHC for lodging, food, and events at the Shade Hotel in Redondo Beach. M. Greenberg is also an officer and/or director of the Skechers Foundation, a 501(c)(3) non-profit entity to which the Company contributed $1 million during 2017.

### E.    J. Greenberg Lacks Independence

108.    Like R. Greenberg and M. Greenberg, J. Greenberg is an executive officer, director, and one of the founders of Skechers.  According to the Company's SEC filings, in 2017, J. Greenberg received total compensation of $303,610.  This amount is material to him.

109.    Additionally, J. Greenberg's father and four of his siblings are employed by the Company.  In addition to defendants R. Greenberg and M. Greenberg, as more fully described herein, for 2017, Jason Greenberg, Joshua Greenberg, and Jennifer Greenberg Messer earned total compensation of $2,280,362, $1,649,339, and $363,820, respectively, as employees of Skechers. Those amounts are material to J. Greenberg's immediate family members.

### F.    Weinberg Lacks Independence

110.    Weinberg is not disinterested for purposes of demand futility because his principal occupation is COO and director of Skechers.  According to the Company's SEC filings, in 2017, Weinberg received total compensation of $3,657,299.  This amount is material to him.

111.    Additionally, two of Weinberg's children are employed by the Company.  Andrew Weinberg and Jeffrey Weinberg earned total compensation of $437,203 and $166,051, respectively, in 2017 as employees of Skechers.  Those amounts are material to Weinberg's children.

112.    Weinberg is also an officer and/or director of the Skechers Foundation, a 501(c)(3) non-profit entity to which the Company contributed $1 million during 2017.

113.    Further, Weinberg is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

**G.** **Demand is Excused as to Erlich, Kosinski, and Siskind Because as Members of the Audit Committee they Face a Substantial Likelihood of Liability**

114. As members of the Audit Committee during the Relevant Period, Erlich, Kosinski, and Siskind participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Erlich, Kosinski, and Siskind were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Erlich, Kosinski, and Siskind, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Erlich, Kosinski, and Siskind.

**H.** **Demand is Futile as to R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Kosinski, Rappaport, Siskind, and Walsh for the Following Additional Reasons**

115. If Skechers' current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Skechers against the Individual Defendants, known as the "insured versus insured exclusion."

116. As a result, if the Director Defendants were to sue themselves or certain of the officers of Skechers, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this

action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

117.     Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Skechers by prosecuting this action. Therefore, demand on Skechers and its Board is futile and is excused. Skechers has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

118.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

119.     The Individual Defendants owed and owe Skechers fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Skechers the highest obligation of loyalty, good faith, due care, oversight, and candor.

120.     All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

121.     Each of the Individual Defendants had actual or constructive knowledge of and caused the Company to fail to disclose that:   (1) Skechers did not have the operational

infrastructure required to meet growing demand and sustain sales growth in China; (2) Skechers' international sales growth, particularly in China, was unsustainable without significant increases in the Company's SG&A expenses; (3) as a result, the Company was relying on expensive, third-party operational solutions; (4) as a result of the foregoing, SG&A expenses would continue to exceed sales growth for the foreseeable future; and (5) as a result of the foregoing, the Company's statements about Skechers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis. These actions caused severe risks to the Company's financial viability and were causing harm to the Company by subjecting the Company to the Securities Class Actions. The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122. The Individual Defendants consciously caused or allowed Skechers to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its SG&A expenses and unsustainable sales.

123. The Individual Defendants consciously failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

124. As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Skechers has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to Skechers and its stockholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Skechers' business, rendering them personally liable to the Company.

## COUNT II

**Insider Trading and Misappropriation of Information
(Against R. Greenberg, M. Greenberg, Weinberg,
J. Greenberg, Erlich, Rappaport, Siskind, and Walsh)**

125.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.    At the time of the stock sales set forth herein, R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh knew of the information described above, and sold Skechers common stock on the basis of such information.

127.    The information described above was proprietary, non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh used for their own benefit when they sold Skechers common stock.

128.    R. Greenberg's, M. Greenberg's, Weinberg's, J. Greenberg's, Erlich's, Rappaport's, Siskind's, and Walsh's sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

129.    Since the use of the Company's proprietary information for their own gain constitutes a breach of R. Greenberg's, M. Greenberg's, Weinberg's, J. Greenberg's, Erlich's, Rappaport's, Siskind's, fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh obtained thereby.

## COUNT III

### For Waste of Corporate Assets
### (Against All Individual Defendants)

130. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

131. The Individual Defendants owed Skechers the obligation to avoid wasting Skechers' assets.

132. The Individual Defendants breached their obligations to Skechers and wasted corporate assets by subjecting the Company to federal securities class action lawsuits, causing the Company to incur substantial costs.

133. Furthermore, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

134. As a direct and proximate result of the waste of corporate assets by the Individual Defendants, Skechers has been and continues to be damaged.

135. Plaintiff, on behalf of Skechers, has no adequate remedy at law.

## COUNT IV

### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the Individual Defendants)

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these proxy law claims.

138. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

139. The 2018 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Skechers stockholders' votes for director re-election, while simultaneously misrepresenting and/or failing to disclose the Company's issues with SG&A expenses and unsustainable sales.

140. As alleged herein, in the 2018 Proxy, the Individual Defendants specifically referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate. Because the Company, under the Individual Defendants' direction and on their watch, was issuing false and misleading statements, the Individual Defendants affirmatively violated the Code. The 2018 Proxy failed to disclose that express terms of the Code were being violated.

141. The Individual Defendants caused the Company to make untrue statements of material facts and omit material facts necessary to make the issued statements not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2018 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2018 Proxy.

142.     The Individual Defendants knew, recklessly disregarded, and/or were negligent in not knowing, that the statements contained in the 2018 Proxy were materially false and misleading.

143.     The omissions and false and misleading statements in the 2018 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2018 Proxy and in other information reasonably available to stockholders.

144.     As a direct and proximate result of the dissemination of the false and/or misleading 2018 Proxy the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Skechers suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Skechers and that Plaintiff is an adequate representative of the Company;

B.     Declaring that each of the Individual Defendants breached and/or aided and abetted the breach of their fiduciary duties to Skechers;

C.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

D.     Ordering R. Greenberg, M. Greenberg, Weinberg, J. Greenberg, Erlich, Rappaport, Siskind, and Walsh to disgorge the profits obtained as a result of their sales of Skechers stock while in possession of insider information as described herein;

E.     Determining and awarding to Skechers restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them;

F.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

G.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  November 27, 2018                          Respectfully submitted,

                                                    **RIGRODSKY & LONG, P.A.**

                                                    /s/ *Brian D. Long*_____
                                                    Brian D. Long (#4347)
**OF COUNSEL:**                                     Gina M. Serra (#5387)
                                                    300 Delaware Avenue, Suite 1220
**BRAGAR EAGEL & SQUIRE, P.C.**                     Wilmington, DE 19801
Marion C. Passmore                                  Telephone:  302-295-5310
Melissa A. Fortunato                                Fax:  (302) 654-7530
885 Third Avenue, Suite 3040                        Email: BDL@rl-legal.com
New York, NY 10022                                         GMS@rl-legal.com
Telephone:  (212) 308-5858
Fax:  (212) 214-0506                                *Counsel for Plaintiff*
Email:  passmore@bespec.com
          fortunato@bespec.com